1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11  MARK GELOW, et al.,
                                       NO. CIV. S-07-1988 LKK/KJM
12            Plaintiffs,

13       v.                                    O R D E R

14  CENTRAL PACIFIC MORTGAGE
    CORPORATION, et al.,
15
              Defendants.
16  _____/

17       Plaintiff Mark Gelow and ten other individuals have brought

18  suit against their former employer, Central Pacific Mortgage

19  Company[1] ("CPM"); its subsidiary, Ivanhoe Financial, Inc.

20  ("Ivanhoe"); and former executive officers of the two companies,

21  John Courson, John Cassell, and Ed Fuchs. Plaintiffs allege that

22  defendants breached their fiduciary duty under ERISA, 29 U.S.C. §

23

24       [1]As the court observed in its February 14, 2008 order,
    although the plaintiffs named "Central Pacific Mortgage
25  Corporation" as the defendant, the entity is actually named Central
    Pacific Mortgage Company. Plaintiffs apparently do not dispute
26  this. See Pls.' Statement of Disputed and Undisputed Facts ¶ 1.

                                    1

1132, violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and are liable for fraud, conversion, and breach of fiduciary duties under state law. In the instant motion, defendants Courson, Cassell, and Fuchs move for summary judgment on all causes of action. For the reasons stated below, the court now grants in part and denies in part the motion.

## I. FACTS[2]

CPM was a California corporation that performed residential mortgage lending through its branch offices in California and elsewhere. Defendant Courson was CPM's President and Chief Executive Officer from 1990 to 2007, when CPM closed. Beginning in 2000, he was also its sole owner and shareholder. Defendant Cassell was Senior Vice President and Chief Financial Officer from 1994 to 2001, at which time he became Executive Vice President of Operations and Administration. Defendant Fuchs was Vice President of Accounting of CPM beginning in 1995 and became Senior Vice President of Finance in 2002 and then Executive Vice President of Finance in 2005.

CPM had branches that originated mortgage loans with borrowers, which it bundled and sold to investors, and other branches that purchased mortgage loans from third-party brokers.

---

[2] All facts are undisputed unless otherwise noted. Each party has objected to several items of the other's evidence. Many of these relate to evidence not relied on by the court in ruling on the instant motion. To the extent that the evidence is relied on, the objections are OVERRULED, except as to defendants' objection to the Declaration of Mark Gelow, discussed *infra* in note 9.

1   Revenues from the bundled and resold loans were used to repay the

2   amount CPM had borrowed to fund the loans, with the surplus used

3   to pay CPM's expenses, including salaries. This surplus was

4   credited to the branch originating the loan that was funded and

5   tracked in CPM's general ledger accounting system.

6       Each of the plaintiffs are former CPM branch managers. The

7   branch managers were employees of CPM and, accordingly, all of the

8   plaintiffs signed a Branch Manager Employment Agreement upon

9   attaining that position. Defendants have tendered the employment

10  agreements for some of the plaintiffs, which provide that the

11  agreement as written constitutes the entire employment agreement

12  between the plaintiff and CPM. See Decl. of Kristina Launey In

13  Support of Defs.' Mot. to Compel Arbitration, Ex. A-G. They also

14  provided that the agreement could only be modified by a signed

15  writing. The agreements set forth the branch manager's

16  compensation. According to the agreements, the branch manager could

17  draw a salary based on the net profit of his or her branch.[3] It is

18  undisputed that the branch managers had unfettered access to the

19  branch's net profits and could receive his or her compensation at

20  intervals and in amounts that he or she wished, although they were

21  required to draw a salary of at least $1,100 per pay period.[4] Each

22  ────────────────

23      [3]It is also undisputed that CPM offered its employees group
    health benefits and a 401(k) retirement plan administered by
24  Merrill Lynch.

25      [4]Plaintiffs state that they dispute this fact, but have
    tendered no evidence in support of that contention. See Pls.'
26  Response to Defs. Statement of Undisputed Fact ¶ 89. Elsewhere,
    plaintiffs' evidence supports this fact. See Gelow Delc. ¶ 5

3

1  manager received a monthly statement setting forth the branch's

2  account balance.

### A.   The Branch Accounts

4      The central dispute between the parties concerns the proper

5  characterization of these funds. There is no dispute that the

6  amount of these funds would naturally fluctuate based on the

7  branch's revenues and expenses at any given time. Defendants

8  contend that the funds were never kept in segregated accounts, but

9  simply represented the maximum amount that the branch managers

10 could draw down. Decl. of John Courson In Support of Defs.' Mot.

11 for Summ. J. ("Courson Decl.") ¶ 8; Decl. of Ed Fuchs In Support

12 of Defs.' Mot. for Summ. J. ("Fuchs Decl.") ¶ 6. Plaintiffs do not

13 dispute that this was the defendants' policy, <u>see</u> Pls.' Response

14 to Defs.' Undisputed Material Facts ¶¶ 50, 52, but contend that the

15 branch net profits were represented to be the branch managers'

16 property and could only be used by the branch manager.[5] Decl. of

17 Mark Gelow In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J.

18 _____

19 ("Defendants Courson, Cassell and Fuchs each told me on more than
   one occasion that provided sufficient amounts were present to cover
20 minimum branch expenses, the account could be used by the branch
   manager owner of the account for any purpose whatsoever . . . .");
21 Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶
   182, 184. The accumulated profits for Gelow's branch appear to have
22 been treated slightly differently than the others, as they were
   used for his salary as well as the operating expenses of another
23 branch. Plaintiffs do not dispute that Gelow was aware of this.
   Pls.' Response to Defs. Statement of Undisputed Fact ¶ 101.

24

25      [5]In his deposition, Gelow testified that he could not recall
   who said this or when. Decl. of Mark Van Brussel In Support of
26 Defs.' Mot. for Summ. J. ("Van Brussel Decl.") Ex. E (Gelow Depo.
   at 65:18-66:3).

4

1  ("Gelow Decl.") ¶¶ 4, 6; Decl. of Bruce Trout In Support of Pls.'
2  Opp'n to Defs.' Mot. for Summ. J. ("Trout Decl.") ¶ 4; Decl. of
3  Erik Fridley In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J.
4  ("Fridley Decl.") ¶ 4; Decl. of Vici Gordon In Support of Pls.'
5  Opp'n to Defs.' Mot. for Summ. J. ("Gordon Decl.") ¶ 4; Decl. of
6  Stephen Herndon In Support of Pls.' Opp'n to Defs.' Mot. for Summ.
7  J. ("Herndon Decl.") ¶ 4; Decl. of Jeff Just In Support of Pls.'
8  Opp'n to Defs.' Mot. for Summ. J. ("Just Decl.") ¶ 4; Decl. of
9  Jenny Mann In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J.
10 ("Mann Decl.") ¶ 4; Decl. of Stephen Meier In Support of Pls.'
11 Opp'n to Defs.' Mot. for Summ. J. ("Meier Decl.") ¶ 4; Decl. of Art
12 Sierra In Support of Pls.' Opp'n to Defs.' Mot. for Summ. J.
13 ("Sierra Decl.") ¶4; Decl. of Jase Stefanski In Support of Pls.'
14 Opp'n to Defs.' Mot. for Summ. J. ("Stefanski Decl.") ¶ 4; Decl.
15 of Gayle Pederson In Support of Pls.' Opp'n to Defs.' Mot. for
16 Summ. J. ("Pederson Decl.") ¶ 4; Decl. of Mark Van Brussel In
17 Support of Defs.' Mot. for Summ. J. ("Van Brussel Decl.") Ex. J
18 (Herndon Depo. at 39:18-40:11). Plaintiffs also contend that CPM's
19 written policies suggested that each branch's net profits were held
20 in a separate account. Gelow Decl. ¶ 17, Ex. 3.

21     It is undisputed that the branch managers' salaries were
22 subject to normal state and federal tax withholdings and deductions
23 and that the branch managers only reported as salary those amounts
24 that they actually drew down from the branch's net profits. When
25 the funds were reported as salary, they would be subject to income
26 tax and thus the managers preferred not to draw down more than they

1  needed. At the end of the year, any net profits the branch retained

2  that had not been drawn as the branch manager's salary would be

3  rolled over to the next year. Defendants have tendered evidence

4  that none of the CPM staff ever said anything to induce the branch

5  managers to leave large balances in the branch accounts. Van

6  Brussel Decl. Ex. E (Gelow Depo. at 51:21-24, 54:11-14, 59:25-

7  60:3), Ex. I (Trout Depo. at 36:5-8). Plaintiffs do not materially

8  dispute this. See Pls.' Response to Defs.' Undisputed Material

9  Facts ¶ 91. It is further undisputed that more than once CPM staff

10  encouraged Gelow to drawn from the account, taking the funds as

11  bonuses. Van Brussel Decl. Ex. E (Gelow Depo. at 42:15-25, 54:4-8,

12  101:22-25), Ex. F (Courson Depo. at 20:19-25, 26:3-27:3), Ex. G

13  (Cassell Depo. at 26:21-27:3); Pls.' Response to Defs.' Statement

14  of Undisputed Facts ¶ 92.

15      Defendants have tendered evidence that Courson, Cassell, and

16  Fuchs did not manage, maintain, or keep segregated branch manager

17  accounts or made representations to this effect to the branch

18  managers, except that Fuchs monitored the branch account balances

19  to the extent that they showed as liabilities on CPM's general

20  ledger. Courson Decl. ¶¶ 6, 8, 10; Fuchs Decl. ¶¶ 4-7; Cassell

21  Decl. ¶¶ 4-7; Van Brussel Decl Ex. H (Fuchs Depo. at 40:17-24,

22  58:9-12); Gelow Depo. at 62:19-63:3-18. Although plaintiffs state

23  that they dispute this, the only evidence they have tendered is

24  Gelow's declaration that these defendants made representations to

25  him about the financial health of CPM and instructed him that the

26  branch manager accounts were to be used by the branch manager for

6

any purpose. See Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶ 111-113, 125 (citing Gelow Decl. ¶¶ 4-6, 14). There is no dispute that none of the individual defendants ever told the plaintiffs that their branch accounts were employee benefits plans or retirement plans. See Defs.' Statement of Undisputed Material Facts ¶ 117; Gelow Depo. 90:16-91:6; Herndon Depo. 80:25-81:12; see also Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶ 193 (undisputed that plaintiff Herndon never understood the branch account to be a retirement vehicle); Van Brussel Decl. Ex. I (testimony of plaintiff Trout that none of the individual defendants ever told him that the branch profits could be used for his retirement). Although Gelow testified that Courson's predecessor told him that the account could be used "for a rainy day," Courson never made a similar statement to him. See Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶ 154-55. Moreover, it is undisputed that none of the individual defendants told the branch managers that they would have access to the funds after the termination of their employment.

It is undisputed that CPM staff never told plaintiffs Herndon or Trout that the money in the branch accounts was unreachable by CPM's creditors. See Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶ 188, 249; see also Declaration of Stephen Herndon in Support of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Herndon Decl.") ¶ 5.

**B.  CPM's Closure**

CPM began experiencing financial difficulties in mid-2006.

1   Later that year, they began negotiations to sell CPM to another

2   company, which was communicated to all CPM employees including

3   through conference calls with and written communications to branch

4   managers by defendant Courson. In January or February 2007,[6]

5   Courson sent a letter to all branch managers advising that CPM had

6   reached its limit of credit for mortgage loans but that it was

7   endeavoring "to return to business as usual." Defs.' Statement of

8   Undisputed Material Fact ¶ 70. Plaintiffs have declared that

9   Courson repeatedly represented during this time that CPM was in

10  good financial health and did not need to be purchased by another

11  company in order to remain open.[7] See, e.g, Gelow Decl. ¶¶ 11, 15;

12  Herndon Decl. ¶¶ 12-14. Plaintiffs Mann and Sierra have declared

13  that defendant Cassell also made similar statements. Mann Decl. ¶

14  11; Sierra Decl. ¶ 12. At the end of February 2007, however, the

15  potential buyer backed out of the purchase. Defendants contend that

16  this occurred because some of CPMS's wholesale branches had

17  recently been recruited away by other companies. Id. ¶¶ 73-74. On

18  February 26, 2007, CPM closed.

19      When it closed CPM owed its lenders and defaulted on these

20  ──────────────────

21      [6]The parties dispute the exact date.

22      [7]It is undisputed that defendant Fuchs did not make statements
    to the plaintiffs concerning the financial health of CPM. Gelow
23  Decl. ¶ 15; Trout Decl. ¶ 12; Fridley Decl. ¶ 12; Gordon Decl. ¶
    12; Herndon Decl. ¶ 12; Just Decl. ¶ 10; Mann Decl. ¶ 11; Meier
24  Decl. ¶ 11; Sierra Decl. ¶ 12; Stefanski Decl. ¶ 12; Pederson Decl.
    ¶ 14; see also Pls.' Response to Defs.' Statement of Undisputed
25  Material Facts ¶¶ 210, 218. It is also undisputed that no branch
    manager ever asked Cassell if the money in the branch accounts was
26  safe or whether CPM was having financial problems. See Pls.'
    Response to Defs.' Statement of Undisputed Material Facts ¶ 208.

1   loans. It used the assets it had to pay certain bills, taxes, and

2   401(k) obligations. According to CPM's accountants, based on the

3   assets it held, at no time prior to CPM's closure did it appear

4   that CPM would not be able to meet its financial obligations.[8] Id.

5   ¶¶ 82-83. CPM's accountant and auditor, Robert Boliard, testified

6   that it only became apparent approximately a week before CPM closed

7   that it did not have sufficient assets to cover its obligations.

8   Van Brussel Decl. Ex. L (Boliard Depo. at 55:23-56:24); see also

9   Pls' Response to Defs.' Statement of Undisputed Material Facts ¶

10  209 (plaintiffs do not materially dispute that prior to CPM's

11  closure, defendant Cassell did not believe the company was in

12  danger of closing). According to Boliard, the primary reason for

13  CPM's financial trouble was buy-back demands from investors to whom

14  CPM had sold the loans and it became clear that "something was

15  going wrong for CPM" when the potential buyer backed out of its

16  "commitment to buy Central Pacific." Id. at 52:6-20, 56:13-24.[9]

17      There is evidence that Fuchs had a conversation with plaintiff

18  Pederson, who called him to express concern about CPM's financial

19  health and her branch's account balance in January 2007. He told

20  her that the company was having financial difficulties but would

21

_____

22      [8]Plaintiffs dispute this, but have tendered no evidence in
    support of their assertion.
23

24      [9]Plaintiffs dispute this only with the declaration of Mark
    Gelow, in which he stated that Cassell and Fuchs knew the company
25  was not in good financial health beginning in 2006, but has
    provided no foundation for this conclusory assertion. See Gelow
26  Decl. ¶ 15. Accordingly the court sustains defendants' objection
    to this portion of the declaration.

survive and that if she was concerned about her branch's balance she could draw down the funds from it. Fuchs Depo. at 37:1:17; Pederson Decl. ¶¶ 6-9. According to Fuchs, this was the only conversation he had with any of the plaintiffs about their financial health of CPM during its last year. Fuchs Depo. at 36:8-22, 60:11-18. Plaintiff Gelow has declared that Fuchs told him on more than one occasion that the branch account funds were his to use as he liked. Gelow Decl. ¶ 5.

Plaintiffs Gelow, Herndon, and Trout, in their deposition testified that they had no knowledge of defendants Cassell or Courson having taken any money from Gelow's branch account for his personal use. Defs.' Statement of Undisputed Material Facts ¶¶ 107, 158, 203, 204, 241. Although plaintiffs now state that they dispute this, they have tendered no material evidence in support of that. See Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶¶ 107, 158, 203, 204, 241.

## II. SUMMARY JUDGMENT STANDARDS UNDER FEDERAL RULE OF CIVIL PROCEDURE 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

////

////

> Under summary judgment practice, the moving party [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*,

1  391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

2      In attempting to establish the existence of this factual

3  dispute, the opposing party may not rely upon the denials of its

4  pleadings, but is required to tender evidence of specific facts in

5  the form of affidavits, and/or admissible discovery material, in

6  support of its contention that the dispute exists. Fed. R. Civ. P.

7  56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank,

8  391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.

9  1998). The opposing party must demonstrate that the fact in

10 contention is material, i.e., a fact that might affect the outcome

11 of the suit under the governing law, Anderson v. Liberty Lobby,

12 Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of

13 Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)

14 (quoting T.W. Elec. Serv., Inc. v. Pacific Elec.Contractors Ass'n,

15 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is

16 genuine, i.e., the evidence is such that a reasonable jury could

17 return a verdict for the nonmoving party, Anderson, 477 U.S. 248-

18 49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200

19 F.3d 1223, 1228 (9th Cir. 1999).

20     In resolving the summary judgment motion, the court examines

21 the pleadings, depositions, answers to interrogatories, and

22 admissions on file, together with the affidavits, if any. Rule

23 56(c); see also In re Citric Acid Litigation, 191 F.3d 1090, 1093

24 (9th Cir. 1999). The evidence of the opposing party is to be

25 believed, see Anderson, 477 U.S. at 255, and all reasonable

26 inferences that may be drawn from the facts placed before the court

12

1  must be drawn in favor of the opposing party, see Matsushita, 475

2  U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,

3  655 (1962) (per curiam)); see also Headwaters Forest Def. v. County

4  of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless,

5  inferences are not drawn out of the air, and it is the opposing

6  party's obligation to produce a factual predicate from which the

7  inference may be drawn. See Richards v. Nielsen Freight Lines, 602

8  F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

9  (9th Cir. 1987).

10                            **III. ANALYSIS**

11         Defendants Courson, Cassell and Fuchs move for summary

12  judgment on all of plaintiffs' causes of action: claim for benefits

13  and breach of fiduciary duty under ERISA, violation of RICO, fraud,

14  conversion, and breach of fiduciary duties. The court considers

15  each in turn.

16  **A.    Claim For Benefits and Breach of Fiduciary Duty Under ERISA**

17         In their first cause of action, plaintiffs allege that the

18  branch accounts were segregated accounts that constituted employee

19  benefit plans under ERISA that could be used for sickness and

20  disability pay and retirement payments. They allege that defendants

21  improperly diverted and embezzled funds from these accounts,

22  breaching their fiduciary duties to plaintiffs.

23         ERISA defines "employee welfare benefit plan" as any benefits

24  plan established for one of many purposes, including surgical,

25  medical, hospital, accident and sickness benefits; vacation pay;

26  and death, unemployment, or long-term disability benefits. 29

                                    13

U.S.C. § 1002(1). ERISA further defines "employee pension benefit plan" as any plan providing retirement benefits or termination pay. 29 U.S.C. § 1002(2)(A)(i), (ii). Whether an ERISA plan exists is a question of fact, decided from the view of the reasonable person in consideration of all of the facts and circumstances. See Kanne v. Conn. Gen. Life Ins. Co., 867 F.2d 489, 492 (9th Cir. 1988).

As the court explained in its order resolving defendants' motion to dismiss, ERISA's preemptive provision is deliberately broad as a means to bring exclusively within federal control the regulation of pension and welfare plans. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45-46 (1987). To qualify as an employee benefits plan, the accounts at issue must demonstrate an ongoing administrative structure and allow reasonable persons to identify and distinguish the plan's beneficiaries, intended benefits, funding source, and the procedures beneficiaries utilize to receive benefits. Winterrowd v. Am. Gen. Annuity Ins. Co., 321 F.3d 933, 938-39 (9th Cir. 2003).

While this is typically not a difficult standard to meet, there must be a plan, not simply an extension of benefits to the employee; and the plan must have terms from which a reasonable person could discern the basic elements of the benefits plan. Id. at 939. As the Supreme Court has explained, a mere provision of one of the benefits listed in the ERISA statute does not, by itself, bring that provision under ERISA. Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 7-8 (1987). Instead, there must be a plan. Id. at 8 ("Nothing in our case law . . . supports appellant's

position that the word 'plan' should be read out of the statute. . . . Given the basic difference between a 'benefit' and a 'plan,' Congress's choice of language is significant in its pre-emption of only the latter.").

Moreover, ERISA does not regulate wage compensation and courts may not extend ERISA's protections to employees' salaries, as doing so would disrupt other federal and state statutory schemes. <u>Cal. Hosp. Ass'n v. Henning</u>, 770 F.2d 856, 861 (9th Cir. 1985). Similarly, the sections of ERISA governing pension plans are limited to retirement income only, not current income. <u>Murphy v. Inexco Oil Co.</u>, 611 F.2d 570, 575 (5th Cir. 1980).

Here, the undisputed facts demonstrate that a factfinder could not reasonably conclude that the accounts of the CPM branches' net profits are "employee welfare benefit plans" or "employee pension benefit plans." According to plaintiffs, there was no plan, even impliedly, that the profits represented in these accounts were disbursed to managers for the particular purpose of providing health, disability, or vacation payments or retirement funds. The funds were undisputedly used for salaries and the only evidence tendered regarding defendants' statements for use of the funds establishes that defendants encouraged plaintiffs to use the surplus for bonuses. <u>See</u> Van Brussel Decl. Ex. E (Gelow Depo. at 42:15-25, 54:4-8, 101:22-25), Ex. F (Courson Depo. at 20:19-25, 26:3-27:3), Ex. G (Cassell Depo. at 26:21-27:3); Pls.' Response to Defs.' Statement of Undisputed Facts ¶ 92. Moreover, there are no terms for these accounts, from which a the structure of a plan

could be discerned by a reasonable person. Instead, the funds could be drawn at any time for any purpose. The mere fact that the funds may have been segregated for plaintiffs' exclusive use, as plaintiffs contend, does not alone indicate that those funds existed as part of an employee benefit plan.

Simply put, ERISA regulates employee benefit plans and, in order to prove that ERISA governs their claims, plaintiffs must make at least a minimal showing that a plan existed. Fort Halifax Packing Co., Inc., 482 U.S. at 7-8; Winterrowd, 321 F.3d at 938-39. Here, that showing has not been made. Defendants' motion is granted on plaintiffs' first cause of action.

**B.    Fraud**

Plaintiffs allege that defendants made false representations to them on which plaintiffs relied. In their opposition to defendants' motion, plaintiffs specify that these included statements that the branch accounts were segregated for plaintiffs' benefit and statements regarding the financial health of CPM.

In order to succeed on a claim for fraud, the plaintiff must show "(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damages." Agosta v. Astor, 120 Cal. App. 4th 596, 603 (2004).

**1.    Allegations Regarding the Nature of the Branch Accounts**

Regarding the allegations that defendants fraudulently misrepresented that the branch accounts were segregated and secured

16

for the branch managers' exclusive benefits, plaintiffs Herndon, Gordon, Just, and Sierra have tendered evidence sufficient to defeat defendants' motion on the first element of this cause of action. Plaintiff Herndon declared that defendant Courson represented to him that the money in the branch manager's account was his alone and no one would touch the money in the account without his permission.[10] Herndon Decl. ¶ 5. Plaintiff Gordon declared that defendants Cassell, Courson, and Fuchs made the same representations to her at a meeting in January 2006. Gordon Decl. ¶ 5. Plaintiff Just has declared that defendants Fuchs, Courson, and Cassell made similar statements to him in the years before CPM closed. Just Decl. ¶¶ 4, 12. Plaintiff Sierra declared that Courson and Cassell similarly told him that the money in the branch manager account was "safe and would be kept available for" him. Sierra Decl. ¶ 6.

As to the remaining plaintiffs, however, there is no evidence that any of the individual defendants made statements to any of the plaintiffs that the accounts of the branches' net profits belonged to the branch managers, were segregated from other CPM funds, or could not be reached by CPM creditors. Instead, most of the plaintiffs' declarations do not identify who made these statements to them or identify persons other than the individual defendants

---

[10]Despite defendants' argument otherwise, Herndon did not contradict this in his deposition testimony. See Herndon Depo. at 78:2-79:11.

17

as being the person who made these representations.[11] Trout Decl. ¶ 4; Stefanski Decl. ¶¶ 4-5; Pederson Decl. ¶¶ 4-5; Mann Decl. ¶¶ 4, 10; Herndon Decl. ¶¶ 4; Friedly Decl. ¶¶ 4-5; Meier Decl. ¶ 4. The only evidence of representations made by the individual defendants to these plaintiffs about the nature of these accounts was that they could be used by the branch managers for any purpose. Gelow Decl. ¶ 5; Pederson Decl. ¶ 5.

Plaintiffs purport to rely on the CPM Finance and Administration Manual for their argument that defendants made these representations, but the document does not support them. See Gelow Decl. ¶ 17, Ex. 3. Instead, the relevant portion, cited in part by plaintiffs, provides that all checks received by a branch "will be deposited into the Company's general bank account and credited to your branch's income account. . . ." Id. at 2.1. This refutes, rather than supports, plaintiffs' contention that the defendants even indirectly represented to them that the net profits generated at each branch were held in separate accounts for the branch managers. Although plaintiffs may have inferred from this that "the money in the branch manager accounts was real money and belonged to the branch managers," Pederson Decl. ¶ 16, they have not tendered evidence that this was ever represented to them by Courson, Cassell, or Fuchs.

Therefore, as to the alleged representations made regarding

---

[11]Plaintiffs have not tendered any evidence that third parties, making such declarations, were the agents of Courson, Cassell, or Fuchs.

1   whether the branch manager accounts were segregated for the branch
2   manager's exclusive use, only plaintiffs Herndon, Gordon, Just, and
3   Sierra have tendered evidence that if credited would permit a
4   factfinder to find that they had established the first element of
5   the fraud claim.

6        Turning to the second element of the cause of action,
7   knowledge of falsity, and the third element, intent, these may be
8   inferred by the circumstances. See Las Palmas Assoc. v. Las Ctr.
9   Assoc., 235 Cal. App. 3d 1220, 1239 (1991); Continental Airlines,
10  Inc. v. McDonnel Douglas Corp., 216 Cal. App. 3d 388, 428 (1989).
11  Here, plaintiffs have presented circumstantial evidence that, if
12  credited, would establish defendants' knowledge of the falsity of
13  their statements and their intent. The individual defendants were
14  the senior management of CPM and one could reasonably infer knew
15  and understood the nature of branch accounts, including whether the
16  funds therein were under the exclusive control of branch managers.
17  Further, given CPM's negotiations for a buyer in 2006, a factfinder
18  could reasonably infer that the defendants did not desire that the
19  branch managers  draw out all of the funds from these accounts, so
20  that CPM would appear to have greater assets in the sales
21  negotiation. From this, a factfinder could conclude that the
22  individual defendants knowingly and intentionally misrepresented
23  to plaintiffs Herndon, Gordon, Just, and Sierra that the funds in
24  the branch accounts were secure and under their exclusive control.

25       Next, defendants must show that no reasonable factfinder could
26  conclude that the plaintiffs justifiably relied on these

1   representations. Defendants first contest that plaintiffs Herndon,

2   Gordon, Just, or Sierra actually relied on statements made

3   concerning the segregated nature of the accounts. It is undisputed

4   that the branch managers did not pay taxes on the amounts in the

5   accounts until they drew them as salaries. See Pls.' Response to

6   Defs.' Statement of Undisputed Facts ¶¶ 29-32. For this reason,

7   defendants argue, plaintiffs did not actually treat the money as

8   their own but as CPM's until funds were drawn down. Nevertheless,

9   a factfinder could reasonably conclude that the plaintiffs chose

10  not to draw down the funds as salary, thus incurring tax liability,

11  precisely because they believed the funds in the branch account

12  would always be available to them.

13      Defendants further argue that plaintiffs' reliance was not

14  justifiable. The reasonableness of a plaintiff's reliance on false

15  statements made by the defendant is typically a question of fact,

16  informed by the plaintiff's knowledge, education, and experience.

17  Guido v. Koopmans, 1 Cal. App. 4th 837, 843-44 (1991). Here,

18  defendants argue that no one with plaintiffs' education and

19  experience could have justifiably believed that the branch accounts

20  were separated, protected accounts, beyond the reach of CPM

21  management or creditors. They have tendered evidence that plaintiff

22  Herndon had a college degree, a real estate license and management

23  experience. Defs.' Statement of Undisputed Facts ¶¶ 17, 168-74.

24  They have not tendered any evidence, however, that Herndon had

25  prior experience with the branch account arrangement employed by

26  CPM or that it was otherwise typical in the industry. Nor have

20

1  defendants directed the court to any evidence of plaintiffs'

2  Gordon, Just, and Sierra's experience or education. Accordingly,

3  the court cannot conclude that no reasonable factfinder could find

4  that Herndon, Gordon, Just, and Sierra were not justified in

5  relying on defendants' statements characterizing the branch

6  accounts.

7  Finally, plaintiffs have tendered sufficient evidence to

8  defeat defendants' motion on the final element of the fraud claim,

9  that they suffered damages. Each has declared that there was a

10  certain sum in his or her branch account and he or she chose not

11  to draw it as salary prior to CPM's closure because of the belief

12  that the funds were secure. Herndon Decl. ¶¶ 8, 11; Gordon Decl.

13  ¶¶ 8, 11; Just Decl. ¶¶ 6, 9; Sierra Decl. ¶¶ 8, 11. This suffices

14  to defeat defendants' motion as to this cause of action.

15  **2.   Allegations Regarding the Financial Health of CPM**

16  With regards to the allegations that the individual defendants

17  made misrepresentations about the financial health of CPM, none of

18  the plaintiffs have tendered any evidence from which a factfinder

19  could find that they had established the first or second elements

20  of a fraud cause of action.

21  There is evidence that each of the individual defendants made

22  statements that CPM was in good financial health and would not

23  close. See, e.g., Just Decl. ¶ 10 (statements of Courson); Sierra

24  Decl. ¶ 12 (statements of Courson and Cassell); Pederson Decl. ¶

25  6 (statements of Fuchs). However, plaintiffs have tendered no

26  evidence that these statements were false or, if they were, that

1  defendants knew of their falsity. The only evidence plaintiffs have

2  tendered is the opinion of plaintiff Gelow that "[b]y the nature

3  of their positions and inside information, Cassell and Fuchs were

4  fundamentally aware of the falsity of [Courson's] statements

5  [professing the financial health of CPM] . . . ." Gelow Decl. ¶ 15.

6  Plaintiff's unfounded opinion that the defendants knew of the

7  falsity of the statements, of course, does not suffice as evidence

8  of a genuine dispute. See Richards, 602 F. Supp. at 1244-45.

9      In contrast, the evidence of defendants is that it was not

10  until a week before CPM's closure that its accountant believed it

11  would close. See Van Brussel Decl. Ex. L (Boliard Depo. at 55:23-

12  56:24). Plaintiffs, in their response to defendants' statement of

13  undisputed facts, argue that defendants' 2004 and 2006 balance

14  sheets demonstrate that CPM could not meet its financial

15  obligations. See Pls.' Response to Defs.' Separate Statement of

16  Undisputed Facts ¶ 84. This interpretation is hardly self-evident

17  in the 2006 balance sheet.[12] See Declaration of Shane Reich In

18  Support of Defs.' Mot. for Summ. J. Ex. 5. More importantly, there

19  is no evidence that the individual defendants had reason to

20  disbelieve their accountant's depiction of the financial health of

21  CPM, derived either from the balance sheets or otherwise.  Simply

22  put, there appears to be no evidence from which a jury could

23  reasonably conclude that plaintiffs established the first or second

24  elements of their cause of action for fraud based on statements the

25

26      [12]A 2004 balance sheet has not been tendered.

1  individual defendants made concerning the financial health of CPM.

2  Accordingly, defendants' motion is denied as to plaintiffs

3  Herndon, Gordon, Just, and Sierra's third cause of action, to the

4  extent that it is based on allegations regarding statements the

5  individual defendants made describing the security and exclusive

6  use of the branch accounts. It is granted as to the other

7  plaintiffs and on all other grounds for this cause of action.

8  **C.   Conversion**

9  In their fourth cause of action, plaintiffs allege that

10 defendants committed the tort of conversion by appropriating the

11 funds in the branch accounts. They allege that all or some of the

12 defendants received this converted property.

13 Conversion is the "wrongful exercise of dominion over the

14 property of another." <u>Spates v. Dameron Hosp. Ass'n</u>, 144 Cal. App.

15 4th 208, 221 (2003) (internal citations omitted). In order to

16 prevail on a claim for conversion, a plaintiff must prove that (1)

17 the plaintiff had ownership or a right to possession of property

18 at the time of the conversion, (2) the defendant converted this

19 property through its wrongful act or disposition of the property

20 rights, and (3) that plaintiff suffered damages. <u>Id.</u>

21 Here, defendants move for summary judgment on the grounds that

22 there was no fixed sum of money that was allegedly converted, that

23 defendants committed no wrongful act, and that this cause of action

24 is preempted by the remedies of the California Labor Code. The

25 court considers each in turn.

26 ////

1       **1.   Whether There Was A Specific, Identifiable Sum**

2       A generalized claim for money is not actionable as conversion.

3  Vu v. Cal. Commerce Club, 58 Cal. App. 4th 229, 235 (1997); see

4  also Farmers Ins. Exch. v. Zerin, 53 Cal. App. 4th 445, 452 (1997)

5  ("a mere contractual right of payment, without more, will not

6  suffice"); accord In re Bailey, 197 F.3d 997, 1000 (9th Cir. 1999).

7  If, however, "there is a specific, identifiable sum involved, such

8  as where an agent accepts a sum of money to be paid to another and

9  fails to make the payment," a cause of action for conversion

10 exists. McKell v. Wash. Mut., Inc., 142 Cal. App. 4th 1457, 1491

11 (2006); see also Fischer v. Machado, 50 Cal. App. 4th 1069, 1072-73

12 (1996). In other words, "money can only be treated as specific

13 property subject to being converted when it is 'identified as a

14 specific thing.'" PCO, Inc. v. Christensen, Miller, Fink, Jacobs,

15 Glaser, Weil, & Shapiro, LLP, 150 Cal. App. 4th 384, 395 (2007)

16 (quoting Baxter v. King, 81 Cal. App. 192, 194 (1927)). That said,

17 it is not necessary that "each coin or bill be earmarked." Haigler

18 v. Donnelly, 18 Cal. 2d 674, 681 (1941).

19      Here, defendants argue that there was no specific sum because

20 there was no literal setting aside of funds for the branch

21 managers. According to defendants, each branch did not have a

22 separate account but rather the "branch accounts" simply

23 represented credits to each branch, while the actual funds were

24 kept in a CPM general account. Plaintiffs don't dispute this

25 contention. Defendants further argue that these sums were not

26 certain but would fluctuate over time, which plaintiffs do not

24

1  materially dispute.

2      Defendants' position is not consistent with the California

3  courts' holdings on this issue. The facts here are similar to those

4  of <u>Fischer</u>, 50 Cal. App. 4th 1069. In <u>Fisher</u>, plaintiffs were

5  farmers and defendant was their sales agent. 50 Cal. App. 4th at

6  1071. Defendant sold plaintiffs' products for them and placed the

7  proceeds in its general operating account, using it to pay salaries

8  and other business expenses. <u>Id.</u> Thereafter, the defendant went

9  bankrupt and never paid plaintiffs the proceeds from the crop sale.

10 <u>Id.</u>

11     The court held that this gave rise to an action for

12 conversion, rejecting defendant's argument that plaintiffs "were

13 not entitled to exercise dominion and control over any specific

14 funds." <u>Id.</u> at 1702. The dispositive fact was not whether the funds

15 were actually segregated, but whether there was an identifiable

16 amount to which plaintiffs were legally entitled. <u>Id.</u> at 1073-74;

17 <u>see also</u> <u>Weiss v. Marcus</u>, 51 Cal. App. 3d 590, 599 (1975);

18 <u>McCafferty v. Gilbank</u>, 249 Cal. App. 2d 569, 571 (1967). As this

19 court has explained elsewhere, "[i]t is immaterial whether the

20 funds at issue were in fact segregated; otherwise, defendants could

21 shield themselves from liability by simply commingling funds." <u>Gulf</u>

22 <u>Ins. v. First Bank</u>, No. S-08-209-LKK/JFM, 2008 WL 2383927 at *3 n.4

23 (E.D. Cal. June 4, 2008).

24     Defendants argument that the amount in the branch accounts was

25 not certain because it fluctuated is similarly unavailing. It is

26 undisputed that the branch accounts contained the net profits from

25

loans originating in that branch. Although the dollar amounts of the accounts would fluctuate as profits were added and expenses, including salaries, were withdrawn, the sums were always ascertainable. In that sense, it seems that the branch accounts fluctuated in the same manner that, for example, an interest-bearing savings account fluctuates: although the dollar amount contained in the account may change daily as interest is compounded, the sum is always ascertainable. See, e.g., PCO, 150 Cal. App. 4th at 396 (collecting cases and observing that "[i]n each of these cases [where an action for conversion was upheld], the amount of money converted was readily ascertainable").

It appears that plaintiffs' claim fails, however, on the second element, that defendants converted the property through a wrongful act. In order to establish this element, the plaintiff must show "an assumption of control or ownership over the property, or that the alleged converter has applied the property for his own use." Shopoff & Cavallo LLP v. Hyon, 167 Cal. App. 4th 1489, 1507 (2008).

Here, plaintiffs have not materially disputed that they have no knowledge or evidence that the Cassell, Courson, or Fuchs took any of the funds in the branch accounts.[13] See Pls.' Response to

---

[13]Plaintiffs have tendered evidence in the form of Gelow's declaration purporting to dispute this, but the cited evidence does not indicate that any of the individual defendants took funds from the branch accounts. See Pls.' Response to Defs.' Separate Statement of Undisputed Facts ¶¶ 158-160 (citing Gelow Decl. ¶¶ 4-6, 10, 11, 14, 15), ¶¶ 203-204 (citing Herndon Depo. at 75:12-77:22); ¶ 241 (citing Trout Decl. ¶¶ 12-14).

1  Defs.' Separate Statement of Undisputed Facts ¶¶ 107, 158-160, 203-
2  204, 214, 240-241. It is also undisputed that the individual
3  defendants only received their salaries from CPM and that they
4  received their last paychecks in the first half of February 2007,
5  prior to CPM's closure. <u>See</u> Pls.' Response to Defs.' Separate
6  Statement of Undisputed Facts ¶¶ 81, 129, 131-134, 252. Although
7  plaintiffs argue in their opposition to defendants' motion that the
8  individual defendants used the funds in the branch accounts for
9  their own salaries prior to CPM's closure, they have tendered no
10  evidence of this at all. Plaintiffs have simply tendered no
11  evidence that the individual defendants, rather than CPM (who is
12  also named as a defendant), appropriated funds from the branch
13  accounts. For this reason, defendants' motion is granted as to this
14  cause of action.[14]

15  **D.   Breach of Fiduciary Duty**

16      In their fifth cause of action, plaintiffs allege that
17  defendants "undertook fiduciary duties to plaintiffs due to their
18  positions within Ivanhoe and Central Pacific and due to their

19  _____

20      [14]The court is not persuaded, however, that plaintiffs' claim
    is barred because an exclusive remedy exists in the Labor Code.
21  Although a plaintiff cannot bring an action for conversion on an
    alleged violation of the Labor Code, <u>Grodensky v. Artichoke Joe's</u>
22  <u>Casino</u>, 91 Cal. Rptr. 3d 732, 775 (2008), <u>review granted</u> No.
    S172237, 2009 WL 2176348 (June 24, 2009), here plaintiffs'
23  conversion claim is not premised on the Labor Code either expressly
    or necessarily. Although defendants contend that plaintiffs' claim
24  seeks unpaid wages, it is undisputed that the branch accounts were
    not only to be used as wages, but "for any purpose whatsoever."
25  Gelow Decl. ¶ 5. It is therefore not apparent that the funds would
    fall under the provisions of the Labor Code governing wages, Cal.
26  Labor Code § 204, or any other section of the code.

representations as alleged. . . ." First Amended Compl. ¶ 49.
According to plaintiffs, defendants breached this duty for their
own benefit. In their opposition to plaintiffs' motion, they
clarify that defendants assumed fiduciary duties by maintaining the
branch accounts for plaintiffs and breached that duty by misleading
plaintiffs "as to the branch accounts." Pls.' Opp'n to Defs.' Mot.
for Summ. J. at 10.

Whether a fiduciary relationship exists is a question of law.
David Welch Co. v. Erskine & Tulley, 203 Cal. App. 3d 884, 890
(1988). The burden lies with the plaintiff to show that a fiduciary
relationship existed. LaMonte v. Sanwa Bank Cal., 45 Cal. App. 4th
509, 517 (1996). In LaMonte, the court found that plaintiff had not
met this burden in its claim that defendant was a fiduciary because
it was a custodian of an account, because "[t]here was no evidence
. . . that [defendant] had either expressly or by implication
agreed to supervise or monitor the finances and accounts of
[plaintiff]." Id. at 517-18. Moreover, in cases where defendant is
alleged to be a custodian of plaintiff's account, the defendants'
fiduciary duties only extend to the scope of its agency, as defined
by the agency agreement between the parties. Id. at 517 (citing Van
de Kamp v. Bank of America, 204 Cal. App. 3d 819, 860 (1988)).

Here, plaintiffs have tendered no evidence from which it could
be concluded that a fiduciary relationship existed between
plaintiffs and the individual defendants regarding the branch
manager accounts. Plaintiffs' own evidence establishes that it was
CPM, not the individual defendants, that maintained the accounts

28

1   and provided accounting services for them. Gelow Decl. Ex. 3. There

2   is no evidence that the individual defendants managed the accounts

3   or otherwise assumed any fiduciary responsibilities to plaintiffs

4   for their maintenance. Because the scope of a fiduciary's duties

5   is strictly defined, see Van de Kamp, 204 Cal. App. 3d at 860, the

6   statements defendants may have made concerning the nature of the

7   accounts and advice to plaintiffs to draw funds from them did not

8   generate a fiduciary relationship between the parties as to the

9   general management and accounting of the accounts, if at all.

10      Because plaintiffs have failed to meet their burden to

11  demonstrate the existence of a fiduciary relationship between the

12  parties, defendants' motion is granted on this cause of action.

13  **E.   Violation of RICO**

14      In their second cause of action, plaintiffs allege that

15  defendants violated the RICO statute, 18 U.S.C. § 1962, so as to

16  give rise to civil liability. Plaintiffs allege that defendants

17  engaged in a scheme to defraud plaintiffs and embezzle funds from

18  the branch accounts.

19      18 U.S.C. § 1962 provides the basis for civil liability under

20  RICO.[15] Turner v. Cook, 362 F.3d 1219, 1228 (9th Cir 2004).

21  Section 1962(a) imposes liability for the use or investment in

22  foreign or interstate commerce of income derived from a pattern of

23

24      [15] Plaintiffs do not specifically allege what sections of 1962
    Defendants violated. However, § 1962(b) pertains to the "collection
25  of unlawful debt" and appears inapplicable to facts alleged in the
    complaint. 18 U.S.C. § 1962(b). In their opposition to defendants'
26  motion, plaintiffs make no reference to § 1962(b).

1   racketeering activity. 18 U.S.C. § 1962(a). An essential element

2   of a cause of action under this subsection is that defendant used

3   or invested the funds derived from racketeering activities, not

4   simply that defendant obtained funds from plaintiff through those

5   activities. Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.,

6   981 F.2d 429, 437 (9th Cir. 1992). Defendants have moved for

7   summary judgment on the grounds that, to the extent that plaintiffs

8   allege that defendants violated this subsection, there is no

9   evidence that the individual defendants invested or used any of the

10  funds they are alleged to have wrongfully obtained. Plaintiffs have

11  offered no opposition to this, see Pls.' Opp'n to Defs.' Mot. for

12  Summ. J. at 10-11, and therefore defendants' motion is granted on

13  this ground.

14      Section 1962(c) imposes liability on a person employed by or

15  associated with an enterprise that affects foreign or interstate

16  commerce for conducting or participating in the affairs of the

17  enterprise through a pattern of racketeering activity. 18 U.S.C.

18  § 1962(c).

19      Here, plaintiffs argue that fraud, conversion, and

20  embezzlement constituted the predicate acts for defendants'

21  liability under RICO. However, they have tendered no evidence of

22  embezzlement and, as discussed above, insufficient evidence of

23  conversion. Therefore, the RICO cause of action may only lie based

24  upon the evidence of fraud, described above. There is some evidence

25  that the assertedly fraudulent communications occurred over the

26  telephone, implicating wire fraud, which is one of predicate acts

1  for which a RICO violation may be found.[16] 18 U.S.C. § 1961(1)(B);

2  18 U.S.C. § 1343; see Herndon Decl. ¶ 5 (Courson made statements

3  over the telephone).

4      The Ninth Circuit has held that an "enterprise" under §

5  1962(c) may be an innocent enterprise or it may be a group of

6  individuals who have combined for an illegal purpose. United Energy

7  Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc., 837 F.2d 356,

8  362 (9th Cir. 1988); see also United States v. Turkette, 452 U.S.

9  576, 580 (1981) ("On its face, the definition [of enterprise]

10 appears to include both legitimate and illegitimate enterprises

11 within its scope. . . ."). The infiltrated enterprise may contain

12 some of the plaintiffs. United Energy Owners Comm., Inc., 837 F.2d

13 at 362-63.

14     Defendants have not directed the court to any authority, let

15 alone any in this circuit, for its assertion that acts of

16 individual defendants employed by a corporation are treated as the

17 corporation's acts for RICO purposes and, therefore, there can be

18 no liability under § 1962(c) because the "person" and the

19 "enterprise" would be a single entity. See Defs.' Mot. for Summ.

20 J. at 31. This interpretation contradicts the plain language of the

21 section, which provides that a person "employed by" an enterprise

22 may be liable for racketeering acts committed through the

23 enterprise. 18 U.S.C. § 1962(c). It is also contrary to the

24

25     [16]In their motion, defendants presently do not challenge that
   there is evidence that they engaged in a scheme to defraud, as
   required under 18 U.S.C. § 1343. See Defs.' Mot. for Summ. J. at
26 29-30.

1  longstanding interpretation of the section as applying to

2  misconduct by persons who have "infiltrated" an innocent

3  enterprise. <u>See</u> <u>Turkette</u>, 452 U.S. at 591; <u>United Energy Owners</u>

4  <u>Comm., Inc.</u>, 837 F.2d at 362-63.

5  Defendants do not move for summary judgment on this cause of

6  action on any other grounds and therefore the court makes no

7  findings as to the additional elements of the cause of action.

8  Because defendants have failed to show that there is no genuine

9  dispute of material fact as to whether they could reasonably be

10  found to have committed fraud and whether they were distinct from

11  the enterprise at issue, the defendants' motion is denied on this

12  cause of action to the extent that it is based on allegations of

13  wire fraud.

14  **F.    Availability of Punitive Damages**

15  Finally, defendants move for summary judgment on the basis

16  that plaintiffs have no evidence that would warrant an award of

17  punitive damages. Under California law, a plaintiff may be awarded

18  punitive damages upon proving by clear and convincing evidence that

19  defendant acted with oppression, fraud, or malice in committing a

20  tort. Cal. Civ. Code § 3294. There is no bar to awarding punitive

21  damages for fraud when the underlying tort is fraud. <u>Miller v.</u>

22  <u>Nat'l Amer. Life Ins.</u>, 54 Cal. App. 3d 331, 336 (1976); <u>Block v.</u>

23  <u>Tobin</u>, 45 Cal. App. 3d 214, 220 (1975); <u>see also</u> <u>Alliance Mortgage</u>

24  <u>Co. v. Rothwell</u>, 10 Cal. 4th 1226, 1241 (1995); <u>Wyatt v. Union</u>

25  <u>Mortgage Co.</u>, 24 Cal. 3d 773, 790 (1979). Therefore, to the extent

26  that plaintiffs Herndon, Gordon, Just, and Sierra have tendered

32

1   adequate evidence to permit a jury to find in their favor on their

2   fraud claim, a jury could also award punitive damages based on

3   defendants' fraudulent conduct under § 3294.

4                             **IV. CONCLUSION**

5      For the reasons stated herein, defendants Courson, Cassell,

6   and Fuchs' motion for summary judgment is GRANTED IN PART. It is

7   DENIED as to plaintiffs' second and third causes of action and

8   prayer for punitive damages, to the extent provided herein.

9      IT IS SO ORDERED.

10     DATED: August 28, 2009.

11

12

13                              LAWRENCE K. KARLTON

14                              SENIOR JUDGE

                               UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26